Crystal **LESSIG**, Defendant-Appellant,

v.

**STATE of Indiana, Plaintiff-Appellee.**

No. 1–985A214.

Court of Appeals of Indiana,
First District.

March 12, 1986.

---

Stephen A. Oliver, Cindy Bagley-Farr, Boren & Oliver, Martinsville, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Amy Schaeffer Good, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for plaintiff-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

The defendant-appellant, Crystal Lessig (Lessig), was convicted of criminal confinement, a Class B felony, by a jury in the Morgan Circuit Court. From a sentence of ten years she appeals.

We affirm.

## STATEMENT OF THE FACTS

The facts most favorable to the judgment reveal that at the time of the crime, Lessig was cohabiting in Martinsville with Chuck Webster (Webster). Webster admittedly suffered from a "bondage fetish." Lessig and Webster had become acquainted with the victim, Mary Akers (Akers), through Akers' live-in boyfriend, Danny Simpson (Simpson). Akers agreed to meet Lessig and Webster on December 7, 1984, at approximately 4:00 p.m. at a gas station somewhere in Martinsville. The meeting was arranged so that Akers could pay Webster ten dollars for a car battery that Webster had given to Simpson. After paying Webster the ten dollars, Akers accompanied the couple back to their home under the pretense that Webster had a "joint of marijuana" for her. Shortly after entering the house, Webster attacked Akers in an attempt to handcuff her. Apparently upon hearing the struggle between Webster and Akers, Lessig entered the room armed with a .25 caliber semi-automatic handgun, pointed it at Akers, and directed her to cooperate or be shot. Throughout the ensuing evening hours, Akers was restrained in one manner or another. During that time period, she drank liquor and watched television with both Lessig and Webster and also with a male visitor who arrived at the couple's house after Akers was initially handcuffed. Later that night, Akers accompanied Webster to a friend's house in order to pick up some marijuana. During the trip, Akers was chained and padlocked to the car's steering column. However, while at the friend's house, she was restrained by a "leash" around her waist, the other end of which was held by Webster. After arriving back at Lessig's and Webster's house and after observing Lessig and the male visitor engage in sexual intercourse on the couch, Webster led Akers back into the bedroom. He unchained her, directed her to disrobe, chained her to the bed, massaged her genital area with a vibrator, and then proceeded to have sexual intercourse with her. The following morning Webster told Akers that he would unchain her for the entire day if she would cooperate. She agreed. Throughout the day Akers remained in the house, unrestrained, watching television as various people, including Webster, came and went. That evening, still unrestrained, Akers ate dinner and drank liquor with both Lessig and Webster and with a different male visitor, John Hammack (Hammack). Later that night, Akers asked and was given permission to retire to the bedroom. Shortly thereafter, Hammack relayed to Webster that he was in need of "companionship." Webster offered to let him "have" Lessig, but Hammack expressed a preference for Akers. Begrudgingly, Webster acquiesced. After obtaining $30.00 from Hammack, Lessig entered the bedroom and told Akers that Hammack would give Akers $20.00 if she would return with him to his house and have sexual intercourse with him. Akers agreed. After promising Lessig and Webster that he would return Akers in the morning, Hammack left with Akers. Upon leaving the couple's home, and apparently according to his prearranged plan, Hammack let Akers go. Akers ultimately returned home and contacted the police. Subsequently, Webster was charged with rape and criminal confinement while Lessig was charged with criminal confinement with a deadly weapon and promoting prostitution.

## ISSUES

Upon appeal, Lessig presents the following issues:

I. Whether the trial court erred in admitting into evidence the prior criminal confinement conviction of Webster.

II. Whether Lessig was provided with effective assistance of counsel during each stage of the proceeding.

III. Whether Lessig's ten year sentence, the presumptive sentence for a Class B felony conviction, was manifestly unreasonable.

IV. Whether there was sufficient evidence to prove that Lessig confined

Akers intentionally or knowingly without Akers' consent.

V. Whether Akers' testimony was of such "incredible dubiosity" that it should have been excluded from consideration.

## DISCUSSION AND DECISION

**Issue I:** *Co-defendant's Prior Criminal Confinement Conviction.*

During cross-examination of Webster, Lessig's co-defendant, the State attempted to enter into evidence his prior conviction for criminal confinement. Upon the State's assertion that the prior conviction was an exception to the general rule prohibiting the admission of such in that the prior crime for which he was convicted fell within the *Ashton* rule's "infamous crimes" exception, Webster's prior criminal confinement conviction was admitted into evidence.

■ It is well settled in Indiana that, generally speaking, evidence of a witness's prior crimes is inadmissible, even upon cross-examination. *Ashton v. Anderson* (1972), 258 Ind. 51, 279 N.E.2d 210. However, exceptions exist. One is the "infamous crimes" exception enunciated in *Ashton.* That exception allows the admission into evidence of a witness's prior conviction of a crime which would have rendered the accused incompetent as a witness at common law. IND.CODE 34–1–14–14; *see also Ashton, supra.*

■ At common law, the crimes of which a conviction rendered witnesses incompetent were treason, murder, rape, arson, burglary, robbery, kidnapping, forgery, and willful and corrupt perjury. *Ashton, supra.* Therefore, under IND. CODE 34–1–14–14 and *Ashton,* evidence of a witness's prior conviction for any of these crimes, collectively referred to as the "infamous crimes," is admissible as evidence relative to the witness's credibility. The State argues that criminal confinement is so akin to kidnapping that it too should be regarded as an "infamous crime" and thus

admissible as affecting Webster's credibility. We agree.

In 1972 when *Ashton* was handed down, the crime of "criminal confinement" technically did not exist. At that time the Indiana Code contained three confinement-type crimes. One of them, not relevant here, was "Child Stealing." *See* IND.CODE ANN. Sec. 10–2902 (Burns 1956). The other two, "Kidnaping" and "Kidnaping for Ransom," are defined as follows:

"Kidnaping.—Whoever kidnaps, or forcibly or fraudulently carries off or decoys from any place within this state, or arrests or imprisons any person, with the intention of having such person carried way from any place within this state, unless it be in pursuance of the laws of this state or of the United States, is guilty of kidnaping, and, on conviction, shall be imprisoned in the state prison during life."

IND.CODE ANN. Sec. 10–2901 (Burns 1956).

"Kidnaping for ransom.—Whoever kidnaps, takes or carries away any person or decoys or entices such person away from any place in this state, with the intent of obtaining from any one any money, means, property or thing of value as a ransom, reward or price for the return of the person so kidnaped, taken, carried, decoyed or enticed away, as aforesaid, or whoever shall imprison, detain or hold any person at any place in this state with the intent of obtaining from any one any money, means, property or thing of value, as a ransom, reward or price for the return, liberation or surrender of the person so imprisoned, detained or held, shall be deemed guilty of the crime of kidnaping for the purpose of ransom, and, on conviction, shall suffer death, or be imprisoned in the state prison during life."

IND.CODE ANN. Sec 10–2903 (Burns 1956).

The current Indiana Code contains two confinement-type crimes labled "Criminal confinement" and "Kidnapping," defined as follows:

"Criminal confinement

(a) A person who knowingly or intentionally:

(1) confines another person without his consent; or

(2) removes another person, by fraud, enticement, force, or threat of force, from one (1) place to another;

commits criminal confinement, a Class D felony. However, the offense is a Class C felony if the other person is under fourteen (14) years of age and is not his child, and a Class B felony if it is committed while armed with a deadly weapon or results in serious bodily injury to another person.

(b) A person who knowingly or intentionally:

(1) removes another person who is under eighteen (18) years of age to a place outside Indiana when the removal violates a child custody order of a court; or

(2) removes another person who is under eighteen (18) years of age to a place outside Indiana and violates a child custody order of a court by failing to return the other person to Indiana;

commits criminal confinement, a Class D felony.

(c) With respect to the violation of subsection (b), it may be considered as a mitigating circumstance if the accused person returns the other person in accordance with the child custody order within seven (7) days after the removal."

IND.CODE 35–42–3–3.

"Kidnapping

(a) A person who knowingly or intentionally confines another person:

(1) with intent to obtain ransom;

(2) while hijacking a vehicle;

(3) with intent to obtain the release, or intent to aid in the escape, of any person from lawful detention; or

(4) with intent to use the person confined as a shield or hostage;

commits kidnapping, a Class A felony.

(b) A person who knowingly or intentionally removes another person by fraud, enticement, force, or threat of force, from one place to another:

(1) with intent to obtain ransom;

(2) while hijacking a vehicle;

(3) with intent to obtain the release, or intent to aid in the escape, of any person from lawful detention; or

(4) with intent to use the person removed as a shield or hostage;

commits kidnapping, a Class A felony."

IND.CODE 35–42–3–2.

Despite the striking similarities between the above two sets of criminal statutes, Lessig argues that the list of common law "infamous crimes" contained in *Ashton* was meant to be exclusive, as evidenced by the lack of any statute or case law expanding the list.

We are aware of the restrictive position taken by the supreme court in *Fletcher v. State* (1976), 264 Ind. 132, 340 N.E.2d 771, in regard to expanding the "infamous crimes" list. We are also aware that *Fletcher* stands to bar the application of the *Ashton* "infamous crimes" exception to the lesser included offenses of the "infamous crimes." However, we do not believe that *Fletcher* prevents us from applying the exception to a crime which is the embodiment of an "infamous crime" that has since undergone a transformation amounting to little more than a mere name change.

After examining the above sets of statutes, we conclude that criminal confinement is the very essence of kidnaping, and that the current crime of "criminal confinement" in fact embodies the 1972 crime of "kidnaping." Not only are their elements extremely similar, but the same moral turpitude involved in the crime of kidnaping, resulting in it being labeled an "infamous crime," is also involved in the crime of "criminal confinement." Whether or not after holding someone against their will, the perpetrator physically moves the victim or seeks a ransom for the victim's release, the essence of the crime is the same. For purposes here, we are concerned with mor-

al turpitude which goes to the unreliability of testimony.

For the reasons above, the "infamous crimes" exception applies to the crime of "criminal confinement." Therefore, Lessig's objection to the admission into evidence of Webster's prior conviction for "criminal confinement" was properly overruled.

Issue II: *Effective Assistance of Counsel.*

Prior to trial, the prosecutor offered to enter into a plea bargain agreement with Lessig. The agreement provided that if Lessig would plead guilty to "criminal confinement," a Class D felony, the prosecutor would dismiss the "criminal confinement with a deadly weapon" charge as well as the "promoting prostitution" charge. Although the presumptive sentence for criminal confinement is two years in prison, *see* IND.CODE 35–50–2–7, under the agreement the prosecutor would recommend one year to be served, one year to be suspended and two years probation. Lessig contends that she rejected the agreement under the presumption that even if she was convicted of both counts as charged, the sentence could be suspended. It is not disputed that prior to rejecting the agreement her attorney informed her that a sentence for criminal confinement with a deadly weapon is suspendable. In fact, it is a non-suspendable offense. *See* IND.CODE 35–50–2–2.

■ In reviewing competency of counsel questions we are restricted by the guidelines set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, as adopted in *Elliott v. State* (1984), Ind., 465 N.E.2d 707. The proper analysis upon review contains two components. First, the defendant must prove that counsel's performance was deficient in that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment to the U.S. Constitution, i.e., that the errors complained of were "unreasonable." *Strickland, supra,* 104 S.Ct. at 2067. Second, the defendant must prove that he suffered prejudice as a result of counsel's action or inaction.

■ Even if, in the instant case, counsel's misinformation regarding the suspendability of a sentence resulting from a criminal confinement with a deadly weapon conviction was not the result of reasonable professional judgment, it is clear from the Record that Lessig suffered no prejudice as the result of the misinformation. For prejudice to have resulted, Lessig needs to prove: (1) that she would have accepted the plea bargain agreement had she known that a sentence from a criminal confinement with a deadly weapon conviction is not suspendible; and (2) that the trial judge would have accepted the plea bargain agreement. She has done neither.

It is beyond question that a trial judge cannot accept an "*Alford* plea," i.e., a plea in which the defendant pleads guilty yet maintains his innocence. *See Alford v. North Carolina* (1970), 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162; *Ross v. State* (1983), Ind., 456 N.E.2d 420. At Lessig's sentencing hearing she stated that she would have pled guilty while maintaining her innocence. If she had so pled, it clearly would have amounted to an *Alford* plea and therefore would have been unacceptable.

Even if Lessig had pled guilty and did not maintain her innocence, she would be unable to show that prejudice resulted from her counsel's misinformation since she cannot possibly prove that the trial judge would have accepted the plea bargain agreement.

Issue III: *Excessiveness of Presumptive Sentence.*

Lessig contends that her ten year sentence, the presumptive sentence for a Class B felony conviction (*see* IND.CODE 35–50–2–5), is mainifestly unreasonable. She argues that although the trial court did consider her age, her lack of a criminal record and the fact that she is the mother of a young girl, it failed to consider evidence that if she goes to prison her daughter might be placed in a foster home; that she wants to raise her daughter on her own; that she has ended her relationship with

Webster; and that she promised to be "a law-abiding citizen."

The standard for sentence review is set out in Ind. Rules of Procedure, Rules for the Appellate Review of Sentences:

"RULE 2. SCOPE OF REVIEW

(1) The reviewing court will not revise a sentence authorized by statute except where such sentence is manifestly unreasonable in light of the nature of the offense and the character of the offender.

(2) A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for which such sentence was imposed."

■ As we noted in *Moritz v. State* (1984), Ind.App., 465 N.E.2d 748, 758–759, *trans. denied:*

"The authority to determine the length of the sentence is vested in the trial court. We will reduce the sentence only where it is manifestly unreasonable in the light of the nature of the offense and the character of the defendant. A finding of mitigating circumstances is discretionary with the trial court." (Citation omitted.)

A sentence is not manifestly unreasonable unless "no reasonable person could find the sentence appropriate to the particular offense and offender." *Robey v. State* (1983), Ind., 454 N.E.2d 1221, 1222.

■ Although the presence of some mitigating factors is not in debate, the fact remains that after having subdued Akers by pointing a deadly weapon at her and threatening to shoot her if she did not cooperate, Lessig criminally confined Akers for two days, a felony about which she has expressed no remorse. Given the above, and the moral depravity existing in her abode, we cannot say that the imposition of the presumptive sentence for a Class B felony was manifestly unreasonable.

## Issue IV: *Sufficiency of the Evidence.*

■ Lessig next contends that there existed insufficient evidence to prove that she knowingly or intentionally confined Akers without Akers' consent.

When reviewing the sufficiency of the evidence, this court will consider only that evidence most favorable to the judgment below along with all inferences to be drawn therefrom. *Connell v. State* (1984), Ind., 470 N.E.2d 701; *Johnson v. State* (1982), Ind.App., 441 N.E.2d 1015. If there is sufficient evidence of probative value as to each element of the offense, the conviction will be upheld. *Connell, supra; Johnson, supra.*

Akers testified that Webster attacked her on his couch; that Lessig then entered the room, pointed a semi-automatic weapon at her and told her to either cooperate or be shot; that over the two days of her confinement, she never expressed consent to Lessig's or Webster's actions; and that she openly wept during her confinement. Akers' testimony was substantially corroborated by State's witness Hammack, who apparently effected her release.

Lessig asks us to reweigh the evidence and judge the credibility of the witnesses. This we cannot do. *Connell, supra; Johnson, supra.* The evidence is sufficient to establish that Lessig confined Akers knowingly and intentionally without Akers' consent.

## Issue V: *Testimony of "Incredible Dubiosity."*

Lessig finally contends that Akers' testimony was of such "incredible dubiosity" that her testimony should have been excluded from consideration. To support her contentions, Lessig cites to *Gaddis v. State* (1969), 253 Ind. 73, 251 N.E.2d 658, and to *Penn v. State* (1957), 237 Ind. 374, 146 N.E.2d 240.

Here Lessig again asks us to reweigh the evidence and judge the credibility of the witnesses. The cases cited by Lessig are easily distinguishable from the case at hand. In *Gaddis, supra,* and *Penn, supra,* the victim's testimony was tainted by one or more of the following: it was coerced by threats of imprisonment; it was utterly unbelievable; and/or it was completely un-

corroborated by either direct or circumstantial evidence. None of those problems exist in Akers' testimony. As stated in our discussion of Issue IV, the evidence is sufficient to sustain the conviction.

For the above reasons, the judgment is affirmed.

Judgment affirmed.

ROBERTSON, P.J., and RATLIFF, J., concur.